FILED

09 OCT -7 AM 11: 01

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JOSHUA RAMSEY AND JEREMY HASKELL, <br><br> Plaintiffs, <br> v. <br><br> NATIONAL ASSOCIATION OF MUSIC MERCHANTS, INC., GUITAR CENTER, INC., FENDER MUSICAL INSTRUMENTS CORPORATION, AND GIBSON GUITAR CORPORATION d/b/a GIBSON U.S.A., <br><br> Defendants. | Case No. '09 CV 2211 BEN POR <br><br> **CLASS ACTION COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

Plaintiffs Joshua Ramsey and Jeremy Haskell, individually and on behalf of all others similarly situated, based upon personal knowledge as to facts pertaining to themselves, and the investigation of counsel and publicly-available information, allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are consumers and direct purchasers of string and fretted instruments, amplifiers and audio recording equipment (hereinafter referred to collectively as "Music Products"). Plaintiffs file this lawsuit, on behalf of themselves and a class of similarly-situated purchasers against the National Association of Music Merchants ("NAMM"), Guitar Center, Inc ("Guitar Center"), Fender Music Instrument Corporation ("Fender"), and Gibson Guitar Corporation d/b/a Gibson U.S.A. ("Gibson") (collectively "Defendants").

2.      As detailed below, Plaintiffs allege that between 2005 and 2007, NAMM organized meetings and conspired with Guitar Center and other Defendants and co-conspirators to exchange pricing information, restrict retail price competition, eliminate price discounting, restrain competition, artificially increase the retail price of Music Products, and adopt, implement and enforce Minimum Advertised Price Policies ("MAPPs"). A minimum advertised price policy, or MAPP, is a pricing policy that does not permit retailers to advertise prices below a specified amount, or to communicate to potential customers that they are willing to discount or sell a product below the MAPP price.

3.      Defendants' conduct as alleged herein has been the subject of a Federal Trade Commission ("FTC") investigation. On April 8, 2009, the FTC filed a complaint alleging that "[b]etween 2005 and 2007, NAMM organized various meetings and programs at which competing retailers of musical instruments were permitted to and encouraged to discuss strategies for implementing minimum advertised price policies, the restriction of retail price competition, and the need for higher retail prices." *In the Matter*

*of National Association of Music Merchants, Inc.*, FTC File No. 001 0203.  The FTC complaint also alleged that "[a]t these NAMM sponsored events, competitors discussed the adoption, implementation, and enforcement of minimum advertised price policies; the details and workings of such policies; appropriate and optimal retail prices and margins; and other competitively sensitive issues."

4.       The FTC alleged that the "exchange of information and opinion arranged by NAMM . . . served no legitimate business purpose[,]" and "had the purpose, tendency, and capacity to facilitate collusion and restrain competition unreasonably."

5.       Following its investigation, the FTC issued a cease and desist order to NAMM and at the same time settled charges that NAMM had "arranged and encouraged the exchange . . . of competitively sensitive information . . . in violation of Section 5 of the FTC Act."  The FTC also found that NAMM's acts and practices "constitute unfair methods of competition in or affecting commerce" in violation of 15 U.S.C. § 45.

6.       According to a published FTC analysis of the NAMM complaint and settlement, "the allegation is that here – taking into account the type of information involved, the level of detail, the absence of procedural safeguards, and overall market conditions – the exchange of information engineered by NAMM lacked a pro-competitive justification."

7.       The NAMM meetings and arranged exchanges of information led to agreements between and among Guitar Center, others retailers, Music Product manufacturers, such as Defendants Fender and Gibson, and other NAMM members to implement a scheme designed to raise and maintain retail prices for Music Products paid by consumers.   As the FTC stated in a press release accompanying the NAMM

settlement, "[t]o the detriment of consumers, NAMM's conduct enhanced the members' ability to coordinate price increases for musical instruments."

8.     NAMM's conduct, and that of other Defendants and unnamed co-conspirators, unreasonably restrained trade in the relevant market(s) (defined below), causing substantial anti-competitive effects and artificially-inflated prices for consumers, all in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2.

9.     As a result of Defendants' anti-competitive conduct, Plaintiffs and other Class members paid more for Music Products purchased during the Class Period (defined below) than they otherwise would have paid in an unrestrained, competitive market.

10.     Additionally, NAMM and Guitar Center's conduct, as alleged herein, took place in or emanated from the State of California. NAMM and Guitar Center, therefore, are subject to liability for unlawful, unfair or fraudulent business practices in violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

11.     Plaintiffs thus seek damages and equitable relief from Defendants under Section 1 and Section 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, and restitution and equitable relief from Defendants NAMM and Guitar Center, specifically, under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

## JURISDICTION AND VENUE

12.     Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees for Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2. Subject matter jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a) and 28 U.S.C. § 1331 and 1337, because this

action arises under the laws of the United States. Jurisdiction is also proper under 28 U.S.C. § 1332(d)(2).

13.     Venue is proper in this federal judicial district under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

## **PARTIES**

14.     Joshua Ramsey is a resident of Glen, New Hampshire. Mr. Ramsey purchased Pro Junior Fender guitar amplifiers and other accessories from Guitar Center during the Class Period.

15.     Plaintiff Jeremy Haskell is a resident of Cumberland County, Maine. Mr. Haskell purchased a Gibson guitar from Guitar Center during the Class Period.

16.     Defendant National Association of Music Merchants, Inc. ("NAMM") is a New York corporation with its principal place of business located at 5790 Armada Drive, Carlsbad, California 92008. NAMM is a music industry trade association comprised of more than 9,000 members. Most U.S. manufacturers, distributors and dealers of musical instruments and related products are members of NAMM. NAMM sponsors two major trade shows each year where manufacturers introduce new products and meet with dealers and competing manufacturers, distributors and retailers to discuss issues of concern to the industry. NAMM also hosts an invitation-only "Global Economic Summit" or "Global Summit" once every three years where key industry leaders,

including representatives of the Defendants named herein, meet to explore emerging markets, reinforce relationships and share visions for industry growth.

17.     Defendant Guitar Center, Inc. ("Guitar Center") is a Delaware corporation and wholly-owned subsidiary of Guitar Center Holdings, Inc.   Guitar Center was a publicly-traded company until October 2007, when it was acquired by Guitar Center Holdings, Inc., formerly VH Acquisition Co., Inc. Guitar Center Holdings, Inc. is a Delaware corporation that was created and is indirectly owned and controlled by the private equity firm, Bain Capital Partners, LLC.   Guitar Center maintains its principal place of business at 5795 Lindero Canyon Road, Westlake Village, California.   Guitar Center is the leading retailer of Music Products in the United States, with 242 stores and the nation's largest direct response retailer (both catalog and online) of musical instruments.   Guitar Center is a member of NAMM and regularly attends NAMM's biannual trade show and convention as a large retailer and/or as a participant at NAMM-sponsored seminars and roundtables.   During the Class Period, Guitar Center participated in meetings and discussions organized and facilitated by NAMM, and conspired with NAMM and other Defendants and co-conspirators to exchange pricing information; adopt, implement and enforce MAPPs; restrict retail price competition; eliminate price discounting; restrain competition and/or artificially increase the retail price of Music Products.

18.     Fender Music Instruments Corporation ("Fender") maintains its principal place of business at 8860 East Chapparral Road, Suite 100, Scottsdale, Arizona.   Fender is a manufacturer and distributor of Music Products and related accessories, and produces the highest-selling line of guitars in the United States.   Fender is a member of NAMM

6

and regularly attends NAMM's biannual trade show and convention, as a product manufacturer and/or as a participant in NAMM-sponsored seminars and roundtables. During the Class Period, Fender participated in meetings and discussions organized and facilitated by NAMM, and conspired with NAMM and other Defendants and co-conspirators to exchange pricing information; adopt, implement and enforce MAPPs; restrict retail price competition; eliminate price discounting; restrain competition and/or artificially increase the retail price of Music Products.

19.     Gibson Guitar Corporation d/b/a Gibson U.S.A. ("Gibson") is a privately-held corporation with its principal place of business located at 309 Plus Park Boulevard, Nashville, Tennessee 37217.  Gibson is manufacturer and distributor of fretted musical instruments, including acoustic and electric guitars, mandolins, and banjos, and is best known for some of its specialty-product lines such as the Les Paul guitar.  Gibson is a member of NAMM and regularly attends NAMM's biannual trade show and convention as product manufacturer and/or as a participant in NAMM-sponsored seminars and roundtables.  Gibson participated in meetings and discussions organized and facilitated by NAMM, and conspired with NAMM and other Defendants and co-conspirators to exchange pricing information; adopt, implement and enforce MAPPs; restrict retail price competition; eliminate price discounting; restrain competition and/or artificially increase the retail price of Music Products.

20.     Various persons or entities not named as Defendants participated as co-conspirators in the wrongful conduct and violations of law alleged herein and performed acts or made statements in furtherance thereof.  The identity of all con-conspirators is

unknown at this time and will require discovery. Plaintiffs reserve the right to name some or all of these persons or entities as Defendants at a later date.

## AGENCY AND AIDING AND ABETTING

21. The acts herein alleged against the Defendants were authorized, ordered or performed by their officers, agents, employees or representatives while actively engaged in the management or operation of Defendants' business or affairs.

22. Plaintiffs are informed and believe and thereupon allege that as to all transactions relevant herein, each Defendant was the agent of one or more Defendants named herein and, as such, each Defendant was acting within the purpose course and scope of such agency. Plaintiff is further informed and believes that each Defendant aided and abetted, acted in concert with or conspired with each and every Defendant to commit the acts and engage in a course of conduct in the acts and business practices complained of herein.

## TRADE AND COMMERCE

23. The activities of Defendants, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

24. In the conduct of their businesses, Defendants directly or indirectly have used the means and instrumentalities of interstate commerce in furtherance of the acts and communications alleged herein. The alleged meetings and exchanges of information arranged by Defendant NAMM were initiated and effectuated by and through, among other things, the United States postal system, nationwide telecommunication networks and/or the nation's common carrier or transportation systems. Defendants Guitar Center, Fender and Gibson are members of NAMM and, during the Class Period, these

Defendants marketed, sold, distributed or shipped substantial quantities of Music Products in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states and which these Defendants manufactured, produced, distributed, marketed or sold such Products.

## SUBSTANTIVE ALLEGATIONS

**A.   The Retail Music Products Market Is Substantially Concentrated And Dominated By Defendant Guitar Center.**

25.    The music product industry is generally understood to include companies that manufacture, supply, distribute or sell musical instruments, accessories and products for amplifying and recording music.

26.    According to *The Music Trades*, the leading industry trade publication, there are distinct product categories within the industry.   One such product category consists of acoustic and electric guitars, fretted instruments (such as the mandolin or banjo), strings, amplifiers and recording equipment.   This product category is defined in paragraph 1, above, and referred to herein as "Music Products."

27.    The United States retail market for musical instruments and related products has been reported in a NAMM-sponsored study to be approximately $7.8 billion in sales.  The Music Products category generated $1.55 billion in retail sales in 2008 – roughly 20% of the national market.

28.    Specialty music retail stores, such as Guitar Center, are the main retail sales venue for music instrument sales in the United States.   According to a national Gallup poll sponsored by NAMM, 57% of all poll respondents preferred specialty music stores, as compared to 23% who prefer to shop on line, and 15 % who preferred warehouse retailers such as Best Buy, Costco or Wal-Mart.

29.     Defendant Guitar Center is the only national chain for musical instruments and related products. Guitar Center dominates the U.S. retail market for Music Products, with 242 retail stores, and is the nation's largest catalog and online retailer musical instruments. Guitar Center consistently ranks as nation's retail sales leader in *The Music Trades* annual report, Retail Top 200. In 2008, Guitar Center reported net sales of over $1.5 billion – approximately one-fifth of the $7.8 billion in sales of musical instruments and related products recorded by U.S. retailers in 2008.

30.     Guitar Center is nearly five times the size of its next largest competitor, Sam Ash Music Corporation. *The Music Trades* ranked its competitor, Sam Ash Music Corporation, second in retail sales in 2008, with 45 stores and $425 million in net sales.

31.     The retail market for Music Products also is characterized by significant entry barriers. To compete with existing retailers, new market entrants, including traditional warehouse retailers seeking to enter the Music Products market, must make large investments in real estate, retail selling space and inventory. As one NAMM observer reported in the March 1, 2008 issue of *The Music Trades*: "To generate reasonable sales volumes, you need a lot of SKUs. I am not sure [Best Buy] will be able will be able to achieve the kind of volume they're hoping for in just 2500 square feet of space." To emphasize the point, Guitar Center has publicly reported that its average large store selling space is 12,000 to 30,000 square feet and includes average inventory of approximately 7,200 core SKUs. By contrast, Best Buy devotes relatively few (2500) square feet within its retail store to musical instruments and related products, and offers consumers only approximately 1000 SKUs – or approximately one-seventh of the product inventory offered at a large Guitar Center store.

32.     Over the last ten years, Guitar Center has grown through acquisitions of former competitors, and achieved dominance in an ever-more-concentrated retail market. In June 1999, Guitar Center acquired Musicians Friend, Inc., an Oregon-based catalog and e-commerce instrument retailer.   In April 2001, Guitar Center bought American Music Group, Ltd., a musical instrument retailer, with 12 retail stores, specializing in the sale and rental of band instruments and accessories serving the student and family market.   In April 2005, Guitar Center purchased Music and Arts Center, Inc., a Maryland-based musical instruments retailer with 80 store locations.   In February 2007, Guitar Center acquired out of a bankruptcy proceeding substantially all of the assets of Dennis Bamber, Inc., also known as The Woodwind & The Brasswind, a catalog and internet retailer.

33.     As a result of acquisitions and decreased competition, Guitar Center's share of the retail market for musical instruments and related products grew from 6.1 % to 26.6 % during the period 1997-2007.

34.     According to independent retailers, Guitar Center wields enormous power in the Music Products market, enabling it to influence product offerings and pricing factors.   In an interview in the April 2007 issue of *Musical Merchandise Review*, Alan Levin of Chuck Levin's Washington Music Center stated:   "The biggest concern [for independent retailers] is Guitar Center.   They are many [Music Product] manufacturers' biggest customers and changes are being made . . . to suit them alone."   Similarly, an unidentified NAMM member, quoted in the March 1, 2008 issue of *The Music Trades*, stated: "Guitar Center has too much leverage [with suppliers]. . . ."

35.     According to publicly-available financial reports filed in 2007, Guitar Center is the largest retail customer of many of its instrument manufacturers and suppliers, including Defendants Fender and Gibson. These manufacturers and suppliers, therefore, depend on Guitar Center for a substantial portion of their retail sales.

**B.     During The Class Period, NAMM Was The Industry Vehicle For Monopolization and Controlling Prices.**

36.     NAMM is the music product industry trade association comprised of more than 9,000 members. Most U.S. manufacturers, distributors and dealers of musical instruments and related products are members of NAMM. As the FTC observed in its March 4, 2009 press release, entitled *National Association of Music Merchants Settles FTC Charges of Illegally Restraining Competition*, "NAMM serves the economic interests of its members by, among other things, promoting consumer demand for musical instruments, lobbying the government, offering seminars and organizing trade shows. In the United States, NAMM sponsors two major trade shows each year, where manufacturers introduce new products and meet with dealers and competing manufacturers, distributors and retailers of musical instruments meet and discuss issues of concern to the industry." Http://www.ftc.gov/opa/2009/ 03/namm.shtm.

37.     During the Class Period, NAMM organized various meetings and programs for its members at which competing retailers of Music Products, and others, were permitted and encouraged to exchange cost and pricing information, and discuss strategies for implementing MAPPs, restricting retail price competition and increasing higher retail prices for Music Products.

38.     NAMM sponsors two major industry trade shows each year. Among other things, NAMM shows provide competitors an opportunity to meet and discuss issues of

concern to the industry.   NAMM shows are considered an indispensable resource by

Music Product retailers.  As one NAMM member stated an interview published in the

*Musical Merchandise Review* in February 2007:

> Many years ago, the importance of attending a NAMM show may
> not have seemed important, today it is absolutely necessary.
> Owners and key personnel should be at NAMM . . . the education
> seminars are priceless.  The interaction with the industry people
> and colleagues is priceless.

39.    An ongoing subject of concern in the Music Products industry, and a key

topic of discussion at the NAMM shows, has been increased price competition for Music

Products.   To address this concern, commencing in 1999 and continuing thereafter,

NAMM and the other Defendants and their co-conspirators fashioned, encouraged and

adopted MAPP pricing as a means to maintain or increase high profit margins.

40.    On August 1, 2001, *The Music Trades* published a report on the potential

effectiveness of MAPPs to protect or increase gross margins for Music Product

manufacturers and retailers who were facing increased competition by internet retailers.

The report revealed the following information:

> Last year [2000] when we polled leading m.i. dealers about the
> value of minimum advertised price (MAP) policies, only 31% said
> they had a positive effect on gross margins.  60% said that MAP
> had no effect at all on selling prices, while 9 % said the programs
> actually decreased margins.  When asked the same questions this
> year [2001], retailers expressed a major change of heart.  51 % said
> that MAP policies had improved their gross margins during the
> past 12 months, and only 44% deemed the policies ineffectual.

41.    *The Music Trades* concluded that this 20-point shift in opinion, over the

one-year period between 2000 to 2001, was due to the fact that "the biggest benefit of

MAP policies has been to rid the internet of loss-leader pricing." As the report goes on to

state:

> As a result [of the MAP policies], these days when you type the name of a popular product into a search engine, you'll get a screen full of results offering the same MAP regulated price. As our poll indicates, brick-and-mortar retailers obviously appreciate the fact that they don't have to deal with a legion of customers coming into the store brandishing a computer print out and demanding, 'Why can't you beat this price?'"

42.     During the Class Period, NAMM organized meetings and programs for dealers and manufacturers to discuss MAPPs and agree on how to restrict price competition.  As part of the biannual trade shows and conventions that occurred during the Class Period, for example, NAMM hosted "NAMM Show University Sessions" designed to facilitate discussion and education among NAMM members on various industry topics, including price competition and restrictions on competition.

43.     One such NAMM program occurred at the August 2005 NAMM show. NAMM hosted a discussion entitled "Does the Industry Need a MAP makeover?"  At this session, according to a November 2005 article published in *The Music Trades*, Music for Everyone, an association of thirteen Greater Los Angeles musical instrument retailers, presented a "voluntary MAP formula/guideline" which was urged and "recommended for general use . . ." by Music Product retailers.

44.     At the January 2006 NAMM show, NAMM again hosted a panel discussion on MAPPs.  The panel included several industry leaders, including Tom Sumner, vice-president and general manager of Yamaha's Pro-Audio and Combo Division; Bob LeClaire, sales manager of Avedis Zildjian; and Robert Lee, sales manager at Kaman Music Corporation (which was acquired by Defendant Fender in early 2008 for $124 million); and several retailers.  As reported in the March 1, 2006 edition of *The*

*Music Trades*, the panelists were "unanimous, offering a guardedly positive assessment of MAP policies."

45.     At this January 2006 NAMM session, only one independent internet retailer, Bryan Junk of massmusic.net, spoke in favor of price competition for the benefit of consumers, stating: "We're supposed to compete, aren't we?"  *The Music Trades* captured some of the dialogue in its March 1, 2006 publication:

> Whether or not you agree with him, Bryan Junk, an internet retailer, deserves credit for staring down an auditorium packed with independent retailers and stating that MAP should be scrapped.  To audible boos, he declared, "*Consumers like low prices, and we try to give them what they want.  Why shouldn't we be able to grow our business by offering the lowest possible prices without interference from the manufacturers?*"

46.     Mr. Junk did not sway his fellow panelists, however.  As reported in *The Music Trades*, panel members persisted in their views that: (i) absent MAPPs "prices would rapidly migrate down to 10% over cost..."; (ii) MAPPs are "only as effective as [their] enforcement"; and (iii) current MAPP pricing guidelines should be revised "upwards to give retailers a better profit margin."

47.     At a separate session hosted by NAMM at the January 2006 NAMM Show, Music for Everyone published and presented with NAMM's participation and consent two MAP pricing formula schedules based on retail costs, which were proposed and "designed for all instruments and all combo and audio products"[1]:

> Proposed MAP Formula
> Recommended Minimum Profit Formulas for A & B Discounts
>
> Retail [$1-$149] x.05 x.2.00 = MAP (0% off retail)*
> Retail [$150-$249] x 0.5 x. 1.90 = MAP (5% off retail)*

---

[1] *The Music Trades* (Nov. 1, 2005), "Marketplace realities demand new approach to MAP policies; with fixed costs the same on all merchandise, a sliding pricing scale makes sense."

Retail [$240-$299] x 0.5 x 1.85 = MAP (7.5% off retail)*
Retail [$300-$349] x 0.5 x 1.80 = MAP (10% off retail)**
Retail [$350-$399] x 0.5 x. 1.75 = MAP (12.5% off retail)**
Retail [$400-$449] x. 0.5 x. 1.70 = MAP (15% off retail)*
Retail [$450-$499] x 0.5 x 1.65 = MAP (17.5% off retail)*
Retail [$500 and up] x 0.5 x. 1.60 = MAP (20% off retail)*
Retail [$500-$599] x 0.5 x. 1.55 = MAP (22.5% off retail)**

\* Formula A
\*\* Formula B

48.     In its NAMM January 2006 presentation, Music for Everyone encouraged manufacturers to adopt the MAP pricing reflected in its Formula A schedule, capping permitted discounts at 20 percent.  Music For Everyone urged that no MAP pricing should be lower than the pricing reflected in its Formula B schedule, stating "the formula B profits are the minimum the brick-and-mortar full service music instrument retailers require to survive, and hopefully thrive."

49.     Thereafter, at the Summer 2006 NAMM Show, NAMM again sponsored a roundtable discussion on MAP pricing, profitability and competition.  This session featured NAMM President and CEO Joe Lammond, Tom Sumner of Yamaha Electronics Corporation, and Fender Chairman and CEO, Bill Mendelo, among others.  NAMM described this discussion in its preview materials as follows:  "In the two-hour session suppliers and retailers of all sizes will be able to share views about critical issues affecting profitability, including MAP pricing . . . and the entrance of mass consumer merchandisers into the industry."  Among the topics discussed at this session were MAP prices that were set too low and industry profit margins.

50.     NAMM continued to facilitate industry discussions of MAPPs and MAP pricing at the Winter 2007 NAMM Show.  At least one roundtable discussion focused on, among other things, profit margins and MAP pricing.  *See, e.g., The Music Trades* (Jan.

16

1, 2007), "Why Going to NAMM is a total no-brainer: new products, smart people, and tons of educational seminars add up to the single biggest business opportunity of the year. If you're serious, there's only one thing to do:  Show Up!"; NAMM 2007 PREVIEW; Calendar.

51.    In addition to the NAMM Shows and the meetings, seminars and roundtables described above, approximately every three years, NAMM hosts a Global Economic Summit or Global Summit.  NAMM uses these invitation-only meetings to bring key industry leaders, media and advisors together "to explore emerging markets, reinforce global relationships and share different visions of the path to long-term, sustainable industry growth."[2]

52.    During the Class Period, NAMM held its Fifth Global Summit, in 2004, and Sixth Global Summit, in 2007, in Carlsbad, California.  According to one press account published in the October 17, 2007 issue of *The Music and Sound Retailer*, NAMM Global Summit attendees "primarily consist[] of supplier decision makers as well as retailers."

53.    Guitar Center CEO Marty Albertson addressed the assembly at the NAMM Sixth Global Summit in 2007, and he or other key representatives of Guitar Center attended or participated in prior Global Summit events.

54.    Defendants Fender and Gibson also attended the NAMM Global Summit events and met with each other, Guitar Center, NAMM and other co-conspirators to

---

[2]    Press Release, "*NAMM Prepares to Host the Fifth Global Economic Summit of the Music Products Industry*," published on NAMM internet website at http://www.namm.org/news/press-releases/namm-prepares-host-fifth-global-economic-summit-mu.

exchange information and discuss strategies for implementing MAPPs, restricting price competition, and maintaining or increasing retail prices for Music Products.

55.     Thus, NAMM organized meetings and programs for its members, at which competing retailers and manufacturer of Music Products, including the Defendants named in this action, were permitted and encouraged to exchange information and discuss strategies for implementing MAPPs, the restriction of retail price competition, and maintaining or increasing retail prices for Music Products.

**C.      The FTC Found The Acts And Practices Alleged Herein Were Anticompetitive And Served No Legitimate Business Purpose.**

56.     In March 2009, the FTC issued a cease and desist order to NAMM and at the same time settled FTC charges that NAMM had "permitted and encouraged" acts constituting violations of Section 5 of the FTC Act, 15 U.S.C. §45.   The FTC also concluded that NAMM had engaged in acts and practices that "constitute unfair methods of competition in or affecting commerce," also in violation of 15 U.S.C. § 45.

57.     Specifically, the FTC alleged – after an investigation that included subpoenas issued to Guitar Center, Fender, Gibson and others – that between 2005 and 2007, NAMM organized various meetings and programs for its members, such as Defendants herein, at which competing retailers of Music Products and others were permitted and encouraged to exchange competitively sensitive information, strategies for implementing MAPP pricing and restrictions on retail price competition.

58.     According to the FTC complaint, "at meetings and programs sponsored by NAMM, competing retailers of musical instruments and other NAMM members discussed strategies for raising retail prices and exchanged information on competitively sensitive subjects such as prices, margins, minimum advertised price policies and their

enforcement." According to the FTC, NAMM was the lynchpin of this anticompetitive activity. "Representatives of NAMM determined the scope of information exchange and discussion by selecting moderators and setting the agenda for these programs."

59.     The FTC complaint further alleged that "[a]t these NAMM sponsored events, competitors discussed the adoption, implementation, and enforcement of minimum advertised price policies; the details and workings of such policies, appropriate and optimal retail prices and margins; and other competitively sensitive issues." According to the FTC, similar discussions were held among Music Product manufacturers.

60.     The FTC determined that the conduct alleged in the FTC complaint, and the "exchange of information and opinion arranged by NAMM[,] . . . served no legitimate business purpose[,]" but rather, "had the purpose, tendency, and capacity to facilitate collusion and restrain competition unreasonably."

61.     In assessing NAMM's conduct, the FTC was cognizant of the fact that trade associations may "serve numerous valuable and pro-competitive functions, such as expanding the market in which its members sell; educating association members, the public and government officials; conducting market research; establishing inter-operability standards; and otherwise helping firms to function more efficiently." Nonetheless, according to the FTC after a several month long investigation, "NAMM's activities crossed the line that distinguishes legitimate trade association activity from unfair methods of competition."

19

62.     In a legal analysis made available to the public with the settlement and

consent decree, the FTC offered the following reasoning for its finding that NAMM's

conduct during the Class Period lacked a legitimate business purpose:

> . . . A Respondent violates Section 1 of the Sherman Act and
> Section 5 of the FTC Act when it engages in concerted conduct that had
> the principal tendency or the likely effect of harming competition and
> consumers. *California Dental Ass'n v. Federal Trade Commission*, 526
> U.S. 756 (1999) (footnote omitted). The conduct of a trade association or
> its authorized agents is generally treated as concerted action. *E.g.,*
> *California Dental Ass'n v. Federal Trade Commission*, 526 U.S. 756
> (1999); *North Texas Specialty Physicians v. FTC*, 528 F.3d 346, 356 (5th
> Cir. 2008) ("When an organization is controlled by a group of
> competitors, it is considered to be a conspiracy of its members.")
>
> The Complaint alleges that at meetings and programs sponsored by
> NAMM, competing retailers of musical instruments and other NAMM
> members discussed strategies for raising retail prices.    Firms also
> exchanged information on competitively-sensitive subjects – prices,
> margins, minimum advertised price policies and their enforcement. And
> not only did NAMM sponsor these meetings, but its representatives set the
> agenda and helped steer the discussions. The antitrust concern is that this
> joint conduct can facilitate the implementation of collusive strategies
> going forward (footnote omitted). For example, such discussions could
> lead competing NAMM members to refuse to deal with a manufacturer,
> distributor, or retailer unless minimum advertised price policies, or
> increases in minimum advertised prices, were observed and enforced
> against discounters (footnote omitted). Alternatively, NAMM members
> could lessen price competition in local retail markets. Any or all of these
> strategies may result in higher prices and harm consumers of musical
> instruments.    Any savings from lower manufacturing costs would be
> reserved to NAMM members, and not shared with consumers in the form
> of lower retail prices.
>
> The potential for competitive harm from industry-wide discussions
> must be weighed against the prospect of legitimate efficiency benefits.
> Here, the Complaint alleges that no significant pro-competitive benefit
> was derived from the challenged conduct. The Commission does not
> contend the exchange of information among competitors is categorically
> without benefit (footnote omitted). Rather, the allegation is that here –
> taking into account the type of information involved, the level of detail,
> the absence of procedural safeguards, and the overall market conditions –
> the exchange of information engineered by NAMM lacked a pro-
> competitive justification.

63.    As part of the settlement and consent order, the FTC has ordered NAMM to cease and desist from:

(a)    Entering into, adhering to, enforcing, urging, encouraging, advocating, suggesting, assisting or otherwise facilitating any Musical Product Manufacturer or Musical Product Dealer to enter into, adhere to or enforce any combination, conspiracy, agreement or understanding between or among any Musical Product Manufacturers or Musical Product Dealers relating to:

(i)    the retail price of any Musical Product;

(ii)    any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer, including, but not limited to, Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies; or

(iii)    the refusal to do business, or the reduction of business, with particular Musical Product Manufacturers or Musical Product Dealers.

(b)    Urging, encouraging, advocating, suggesting, coordinating, participating in, or facilitating in any manner the exchange of information between or among Musical Product Manufacturers or Musical Product Dealers relating to:

(i)    the retail price of any Musical Product; or

(ii)    any term, condition or requirement upon which any Musical Product Manufacturer or Musical Product Dealer deals, or is willing to deal, with any other Musical Product Manufacturer or Musical Product Dealer, including but not limited to Price Terms, margins, profits, or pricing policies, including but not limited to Minimum Advertised Price Policies or Resale Price Maintenance Policies.

21

64. _ According to the FTC, the consent order is "designed to remedy NAMM's anticompetitive conduct." The Commission's vote to accept the complaint and consent order was 4-0.

**D.    Defendants Have Unreasonably Restrained Trade, Prevented Competition And Imposed Supra-Competitive Prices on Consumers.**

65. Defendants agreed to adopt, impose or enforce MAP pricing, and in fact adopted, imposed or enforced such MAPPs throughout the Class Period.

66. The MAPPs imposed and enforced by Defendants went well beyond typical cooperative advertising programs where manufacturers place restraints on the prices dealers may advertise in advertisements funded in whole or in part by the manufacturer.    Instead, with NAMM's knowledge, cooperation and assistance, Defendants and other unnamed co-conspirators devised a plan to exact agreements from Music Product manufacturers sold through Guitar Center and other NAMM retailers to require, on penalty of termination and as a condition of doing business, that the manufacturer ensure that its other retailers maintain the MAP pricing policy and/or refrain from discounting.

67. As detailed above, NAMM facilitated the discussion of; and sought and obtained the agreement of its members, to impose and enforce these MAPPs for the benefit of Defendants Guitar Center, Fender, Gibson and other co-conspirators, and not for any legitimate pro-competitive purpose.

68. The MAPPs imposed on music retailers by Defendants are anticompetitive. According to a *Wall Street Journal* report dated October 23, 2008, Bradley Reed, sales manager for Musician's Advocate, Inc., said "it [his company] had very little choice but to honor manufacturer's policies on advertised prices because

otherwise it risks having its supplies cut off or being delisted as an authorized distributor."

**E.    The Relevant Market And The Anticompetitive Effects of Defendants' Conduct.**

69.    For purposes of this action, the relevant product market is the retail sales of Music Products.

70.    For purposes of this action, the relevant geographic market is the United States of America.

71.    By virtue of their power to control prices and exclude competition in the relevant market, as described herein, Defendants at all relevant times possessed market power in the relevant market.

72.    Likewise, Defendants at all relevant times possessed substantial market power in the market(s) for their products due, in large part, to the high level of product differentiation in the industry.  Specifically, Defendants Guitar Center, Fender, Gibson and their co-conspirators:  (a) sold their Music Products at prices substantially in excess of marginal costs; (b) enjoyed high profit margins thereon (e.g., gross margins of approximately 30%, as compared to 22% gross margins for consumer electronics); (c) sold such products substantially in excess of the competitive price; and (d) enjoyed substantial barriers to market entry and growth by new entrants or potential competitors.

73.    Defendants also exchanged competitively sensitive information that had the purpose, tendency and capacity to facilitate price coordination among competitors.

74.    Defendants' actions in adopting, implementing and enforcing MAPPs have had the following anticompetitive effects, among others, in the relevant market:

(a)   Competition in the relevant market has been unreasonably restrained or suppressed;

(b)   Potential competitors have been restrained from entering into the relevant market and have been prevented from competing effectively against Defendants;

(c)   Purchasers of Music Products have been denied the benefits of competition in a free and open market and have been forced to pay artificially high prices for such Products;

(d)   Upon information and belief, Defendants have enjoyed, and will continue to enjoy, ultra competitive profits to the detriment of competitors and purchasers of Music Products.

75.   The aforementioned anticompetitive effects of Defendants' conduct on competition in the relevant market outweigh any conceivable pro-competitive benefits.

## CLASS ACTION ALLEGATIONS

76.   Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), (b)(2) and/or (b)(3), and 23(c)(4) on behalf of the following Class:

> All persons who, from January 1, 2005 through December 31, 2007 ("Class Period"), purchased one or more Music Products directly from any of the following:   Guitar Center, Inc., Fender Music Instruments Corporation, Gibson Guitars d/b/a Gibson USA or any co-conspirator named as a defendant in this action ("the Class").

77.   This action has been brought and may properly be maintained on behalf of the Class proposed above under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

78. **Numerosity.** Members of the Class are so numerous that their individual joiner is impracticable.

79. While the exact number of Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of Class members. Plaintiffs also believe that Class members are sufficiently numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

80. **Existence and predominance of common questions.** Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common questions include:

a. Whether Defendants conspired or engaged in concerted action in restraint of trade;

b. Whether Defendants conspired or engaged in a concerted action to control price or eliminate competitors from the relevant market;

c. Whether Defendants' conduct as alleged herein caused Plaintiff and Class members to pay more for Music Products than they otherwise would have paid in an unrestrained, competitive market;

d. The identities of the co-conspirators;

e. The duration of the alleged combination or conspiracy and nature and character of the acts done in furtherance of the alleged combination or conspiracy;

f. Whether the alleged combination or conspiracy violated Section 1 of the Sherman Act;

g.      Whether the alleged combination or conspiracy, and the nature and character of the acts done in furtherance of the alleged combination or conspiracy, violated the California Unfair Competition Law, California Business and Professions Code §§ 17200 *et seq.*;

h.      Whether Defendants actively concealed the contract, combination or conspiracy from Plaintiffs and other Class members;

i.      Whether Defendants engaged in one or more agreements, contracts, combinations or conspiracies which had the purpose or effect of unreasonably restraining competition or limiting consumers' access to competing and lower-priced Music Products;

j.      Whether Plaintiffs and other members of the Class were injured by the conduct of defendants and their co-conspirators and, if so, the appropriate class-wide measure of damages and appropriate injunctive relief; and

k.      Whether Plaintiffs and the Class are entitled to declaratory, equitable or injunctive relief.

81.      **Typicality.** Plaintiffs' claims are typical of the claims of the Class in that each of the Plaintiffs, like other Class members:

a.      Purchased one or Music Products from one or more of the Defendants described in the Class definition;

b.      Lost money and/or were damaged as a result of the same wrongful conduct of the Defendants as alleged herein; and

c.      Seek relief common to the Class.

26

82.   **Adequacy.**  Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, and intend to prosecute this action vigorously.  The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

83.   **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joiner of all members is impracticable.  Furthermore, while the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

84.   Furthermore, even if the Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, is in fact manageable, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  The benefits of adjudicating this controversy as a class action far outweigh any difficulties that may occur in managing the Class.

85.   In the alternative, the Class may be certified under the provisions of Federal Rules of Civil Procedure 23(b)(1), (b)(2), and/or 23(c)(4) because:

a.   The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to

individual Class members and would establish incompatible standards of conduct for defendants;

        b.     The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be disparities of the interests of other Class members not parties to the adjudications, or substantially impair or impede the ability of other Class members to protect their interests;

        c.     Defendants have acted or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief with respect to the members of the Class as a whole an appropriate form of relief; and

        d.     The claims of Class members are comprised of common issues that are appropriate for certification under Rule 23(c)(4).

## TOLLING OF STATUTE OF LIMITATIONS, ESTOPPEL, FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

     86.    Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon herein until immediately prior to commencing this civil action.

     87.    Defendants' actions were unlawful, unfair and deceptive.  As a consequence, unwary consumers were injured by Defendants' unlawful conduct. Defendants are estopped from relying on any statute of limitations defense because of their unlawful, unfair or deceptive conduct.

     88.    Defendants' conduct was, by its nature, self-concealing.  Defendants, through a series of affirmative acts or omissions, suppressed the dissemination of truthful

information regarding their illegal conduct, and actively foreclosed Plaintiffs and the Class from learning of their anti-competitive, illegal, unfair and/or deceptive acts.

89.     Any applicable statutes of limitations have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations.  Because of the self-concealing nature of Defendants' actions and their affirmative acts of concealment, Plaintiffs and the Class assert the tolling of any applicable statutes of limitations affecting the claims raised herein.

90.     By reason of the foregoing, the claims of Plaintiffs and the Class are timely under any applicable statute of limitations, pursuant to the discovery rule, estoppel principles, and the equitable tolling and fraudulent concealment doctrines.

## FIRST CLAIM FOR RELIEF

### (Against all Defendants for Violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1)

91.     Plaintiffs hereby incorporate by reference each preceding paragraph as though fully set forth herein.

92.     Beginning in at least 2005, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants or their co-conspirators, Defendants and said co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) by artificially reducing or elimination competition in the relevant U.S. market for Music Products.

93.     In particular, Defendants combined or conspired to raise, fix, maintain or stabilize the price of Music Products sold in the United States.

94.     The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding or concerted action among Defendants and their co-conspirators.

95.     Defendants and their co-conspirators committed acts or made statements in furtherance of formulating and effectuating their contract, combination or conspiracy, including:

a.      Participating in meetings and conversations to discuss the prices and supply of Music Products;

b.      Communicating in writing or orally to fix target prices, floor prices or price margins for Music Products;

c.      Exchanging competitively-sensitive information to facilitate their combination or conspiracy, including information concerning minimum advertising pricing factors, schedules and policies, the details and workings of such policies, appropriate and optimal retail prices and margins, strategies for raising retail prices for Music Products, and other commercially- or competitively-sensitive information;

d.      Agreeing to manipulate prices and the supply of Music Products sold in the United States in a manner that deprived consumers of free and open competition; and

e.      Selling Music Products to customers in the United States at artificially-inflated, noncompetitive prices.

96.     As a result of Defendants' unlawful or anticompetitive conduct, Plaintiffs and other members of the Class were injured in their business or property in that they

paid more for Music Products than they otherwise would have paid in the absence of Defendants' unlawful or anticompetitive conduct.

## SECOND CLAIM FOR RELIEF

### (Against all Defendants for Violations of 15 U.S.C. § 1 – Agreements Restraining Trade)

97.    Plaintiffs hereby incorporate by reference each preceding paragraph as though fully set forth herein.

98.    Defendants, through their actions as described herein constituting agreements and their enforcement, engaged in combinations or conspiracies that substantially, unreasonably or unduly restrained trade in the relevant market(s) during the Class Period, and harmed Plaintiffs and the Class thereby.

99.    The relevant product market is Music Products and the relevant geographic market is the United States.

100.    The actions alleged herein cover a sufficiently substantial percentage of the relevant market(s) to harm competition.

101.    The actions of the Defendants directly or through NAMM constitute concerted action.

102.    NAMM and the other Defendants are *per se* liable for the creation, maintenance and enforcement of their agreements.

103.    Alternatively, NAMM and the other Defendants are liable for the creation, maintenance and enforcement of their agreements under a "quick look" or rule of reason standard.

104.    There is no legitimate, pro-competitive business justification for Defendants' combination or conspiracy, or their agreement to restrain competition or

artificially inflate the price of Music Products – by implementing or enforcing minimum advertised pricing policies, or by or through the other unlawful, unfair or anticompetitive conduct alleged herein – that outweighs the harmful effects of such conduct.

105.   Plaintiffs and members of the Class were injured in their business or property by the collusion and combination or conspiracy alleged above, which facilitated, enabled, assisted or furthered Defendants' actions to substantially foreclose or exclude competition in the relevant market(s).   Without limiting the generality of the foregoing, Plaintiff and the other members of the Class have been forced to pay higher prices for Music Products than they would have paid in the absence of Defendants' unlawful conduct.

## THIRD CLAIM FOR RELIEF

### (Against Defendants NAMM and Guitar Center for Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 – Attempted Monopolization)

106.   Plaintiffs hereby incorporate by reference each preceding paragraph as though fully set forth herein.

107.   This claim is pled as against NAMM and Guitar Center only.

108.   NAMM conspired with Guitar Center and/or other co-conspirators to control prices and exclude or destroy competition in the relevant market(s), and engaged in other acts, including but not limited to exchanging competitively-sensitive information and proposing, adopting, implementing and enforcing minimum advertised pricing policies, with the specific interest to achieve monopoly power in the relevant product market.

109.   The natural and probable consequence of NAMM's and Guitar Center's actions, which was foreseeable both to NAMM and to Guitar Center, was to give Guitar

Center control over prices and/or to exclude or destroy competition in the relevant market(s).

110.   There is a substantial and real chance, a reasonable likelihood and/or a dangerous probability that Guitar Center will achieve monopoly power in the relevant market(s).   Guitar Center continues to dominate this market through the unlawful conduct described above, to the detriment of Plaintiffs and the Class.

111.   Plaintiffs and members of the Class were injured by Defendants' attempted monopolization of the relevant market(s).   Without limiting the generality of the foregoing, Plaintiffs and other Class members have been forced to pay higher prices for Music Products in the relevant market(s) than they would have paid in the absence of Defendants' unlawful conduct.

## FOURTH CLAIM FOR RELIEF

**(Against Defendants NAMM and Guitar Center for Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*)**

112.   Plaintiffs hereby incorporate by reference each preceding paragraph as though fully set forth herein.

113.   This claim is pled by Plaintiffs and Class members against Guitar Center and NAMM only.

114.   The acts and practices of Guitar Center and NAMM, as described herein, constitute unlawful, unfair or fraudulent business practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*

115.   The acts and practices of Guitar Center and NAMM, as described herein, constitute unlawful business practices in that Guitar Center and NAMM combined or conspired with other Defendants and co-conspirators to unreasonably restrain trade and

33

commerce by artificially reducing or eliminating competition in the United States and/or by raising, fixing, maintaining or stabilizing the prices for Music Products in the United States, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  Guitar Center and NAMM, through their actions, also have unduly restrained trade in the relevant market(s) in the United States, in violation of 15 U.S.C. § 1.  Guitar Center and NAMM also conspired with other Defendants and their co-conspirators to control prices and exclude or destroy competition in the relevant market(s) and/or engaged in other acts and practices with the specific interest of having Guitar Center achieve monopoly power in the relevant market(s), in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2.

116.    The acts and practices of Guitar Center and NAMM, as described herein, also constitute unfair or fraudulent business practices.  The utility of these Defendants' acts and practices in restricting competition in the Music Products market in the United States is significantly outweighed by the gravity of the harm that such acts and practices impose on Plaintiffs and Class members.  Defendants' acts and practices also are oppressive, unscrupulous or substantially injurious to Plaintiffs and Class members.

117.    The unlawful, unfair or fraudulent acts and practices of NAMM and Guitar Center alleged herein emanated from or occurred within the State of California.  Specifically, NAMM and Guitar Center each maintain a principle place of business in California.  Furthermore, as alleged herein, NAMM devised, implemented and directed a scheme at its principle place of business in Carlsbad, California, through which Guitar Center, other Defendants and other co-conspirators met and exchanged information, discussed strategies for implementing MAPPs, and combined or conspired to restrict

price competition and/or maintain or increased the retail price for Music Products. Additionally, Guitar Center received ill-gotten gains from its wrongful acts and practices, as alleged herein, at its headquarters and principle place of business in Westlake Village, California.

118.    Plaintiffs and Class members have suffered harm as a proximate result of the wrongful conduct of NAMM and Guitar Center, and Plaintiffs therefore seek appropriate restitution.

119.    Plaintiffs and Class members have suffered injury in fact and have lost money or property as a result of these Defendants' acts and practices, in that Plaintiffs and Class members paid artificially high prices for Music Products due to Defendants' unlawful agreement, combination or conspiracy and their unlawful, anticompetitive practices.

120.    Plaintiffs and Class members also seek an order, pursuant to Cal. Bus. & Prof. Code § §17200 and 17203, enjoining NAMM and Guitar Center from continuing to engage in the unlawful, unfair and fraudulent acts and practices described herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that:

A.    The Court determine that his action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and enter an order appointing Plaintiffs as class representatives for the Class and appointing Plaintiffs' counsel as Class Counsel;

B.    The acts and practices herein alleged be adjudged and decreed to be unlawful acts or practices in violation of Sections 1 and 2 of the Sherman Act, and/or the

California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, and that Defendants be enjoined from further violative conduct;

C.      The acts and practices herein alleged be adjudged and decreed to be unfair or fraudulent acts or practices in violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, and that Defendants be enjoined from further violative conduct;

D.      Plaintiffs and each member of the Class recover threefold the damages determined to have been sustained by each of them;

E.      Plaintiffs and each member of the Class recover restitution determined to be owed to them as permitted by the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17203;

F.      Plaintiffs and the Class recover their costs of suit, including reasonable attorneys' fees, litigation costs and expert fees as provided by law;

G.      Judgment be entered against Defendants and in favor of Plaintiffs and the Class; and

//

//

//

//

//

//

//

H.     Plaintiffs and the Class be granted such other appropriate relief as may be determined to be just, equitable and proper by this Court.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:   October 6, 2009                    Respectfully submitted,

**GIRARD GIBBS, LLP**

By: _____
       Elizabeth C. Pritzker (SBN # 146267)
       ecp@girardgibbs.com

       Daniel C. Girard (SBN # 114826)
       dcg@girardgibbs.com
       Aaron M. Sheanin (SBN # 214472)
       ams@girardgibbs.com
       **GIRARD GIBBS LLP**
       601 California Street, 14th Floor
       San Francisco, CA 94108
       Telephone:  (415) 981-4800
       Facsimile:  (415) 981-4846

       Kenneth M. Gilman
       kgilman@GilmanPastor.com
       **Gilman and Pastor, LLP**
       16 14th Avenue
       Wareham, MA  02571
       Telephone:  (508) 291-8400
       Facsimile:  (508) 291-3258

       Counsel for Plaintiffs Joshua Ramsey and
       Jeremy Haskell

Case 3:09-cv-02211-BEN-POR   Document 1   Filed 10/07/09   Page 38 of 40

**ORIGINAL**

**CIVIL COVER SHEET**

JS 44 (Rev. 12/07)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
JOSHUA RAMSEY AND JEREMY HASKELL

**DEFENDANTS**
SEE ATTACHED

09 OCT -7 AM 11: 01

CLERK, U.S. DISTRICT COURT
SOUTHERN DIST. SAN DIEGO, CA

**(b)** County of Residence of First Listed Plaintiff  Glen, NH
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  San Diego, CA
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

BY: _____

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

**'09 CV 2211 BEN POR**

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 480 Consumer Credit |
| | | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | | ☐ 465 Other Immigration Actions | | |

Under TORTS PERSONAL INJURY: ☐ 362 Personal Injury - Med. Malpractice; ☐ 365 Personal Injury - Product Liability; ☐ 368 Asbestos Personal Injury Product Liability. PERSONAL PROPERTY: ☐ 370 Other Fraud; ☐ 371 Truth in Lending; ☐ 380 Other Personal Property Damage; ☐ 385 Property Damage Product Liability. PRISONER PETITIONS: ☐ 510 Motions to Vacate Sentence; Habeas Corpus: ☐ 530 General; ☐ 535 Death Penalty; ☐ 540 Mandamus & Other; ☐ 550 Civil Rights; ☐ 555 Prison Condition.

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. Sec. 1
Brief description of cause:
Violation of Sherman Act Sec. 1, and various state unfair trade practice and antitrust statutes

**VII. REQUESTED IN COMPLAINT:** ☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $   CHECK YES only if demanded in complaint: JURY DEMAND: ☑ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):   JUDGE Hon. Larry A. Burns   DOCKET NUMBER 3:09-cv-2002-LAB-JMA

DATE 10/06/09   SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 6003   AMOUNT 350.   APPLYING IFP   JUDGE   MAG. JUDGE

10/07/09

## CIVIL CASE COVER SHEET

**Defendants**

NATIONAL ASSOCIATION OF MUSIC MERCHANGES, INC.

GUITAR CENTER, INC.

FENDER MUSICAL INSTRUMENTS CORPORATION

GIBSON GUITAR CORPORATION d/b/a GIBSON U.S.A.

Court Name: USDC California Southern
Division: 3
Receipt Number: CAS006003
Cashier ID: sramirez
Transaction Date: 10/07/2009
Payer Name: GIRARD GIBBS LLP
--------------------------------
CIVIL FILING FEE
 For: GIRARD GIBBS LLP
 Case/Party: D-CAS-3-09-CV-002211-001
 Amount:      $350.00
--------------------------------
CHECK
 Check/Money Order Num: 11529
 Amt Tendered:  $350.00
--------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


There will be a fee of $45.00
charged for any returned check.